IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 11 CR 670 |
| | ) | |
| FRANK STEPHEN PONS | ) | Judge Virginia M. Kendall |
| | ) | |

## MEMORANDUM OPINION AND ORDER

On September 27, 2011, a federal Grand Jury indicted Defendant Stephen Pons ("Pons") in a three count Indictment charging, *inter alia*, that Pons devised, intended to devise, and participated in a scheme to defraud Diversity Real Estate Capital ("DREC"), an Illinois limited liability company comprised of real estate investors, using interstate wires in violation of 18 U.S.C. § 1343. In prosecuting this case, the Government seeks to rely upon the testimony of Frederick Kaplan ("Kaplan"), an attorney who represented Pons in a series of real estate transactions which, according to the Government, were fraudulently procured and form the basis of its charge. The Government maintains that Kaplan has indicated a willingness to cooperate and provide additional information regarding his communications with Pons with respect to the transactions but has stated that he cannot do so based on attorney-client privilege concerns related to his previous representation of Pons. The Government filed this Motion seeking an order finding that the crime/fraud exception to the attorney-client privilege applies in this case, arguing that Kaplan was used by Pons to facilitate fraud against DREC. For the reasons stated below, the Government's Motion for Finding of Crime/Fraud Exception to Attorney-Client Privilege is granted.

# BACKGROUND

According to the Indictment, Pons purchased and managed real estate properties through various limited liability companies, including FSP Investment Group, LLC ("FSP") (Indict., Dkt. No. 1, ¶ 1.) In August 2004, Pons entered into an agreement with DREC to form FSP-Diversified, LLC ("FSP Diversified") for the purpose of owning an renovating certain properties, including 1338-54 West Argyle Street, Chicago, Illinois (the "Argyle property") (*Id.* ¶ 1(d); Gov. Mot., Dkt. No. 27, Ex. B, p. 3.) The August 6 agreement appointed Pons as FSP Diversified's manager and authorized Pons to conduct FSP Diversified's day-to-day business activities, subject to a provision requiring Pons to obtain all members' written consent prior to any "major decision." (Indict. ¶ 1(e).) "Major decision" was defined in the August 6 agreement to include any sale, conveyance, lease, encumbrance, mortgage, pledge or other transfer of any property, including the Argyle property. (*Id*; Gov. Mot., Ex. D, p. 3.) The agreement also provided that DREC had priority in receipt of any proceeds derived from the properties that FSP Diversified owned, including the Argyle property. (Indict. ¶ 1(f); Gov. Mot., Ex. A, p. 3.) On or about October 6, 2005, Pons, through FSP, and DREC entered into an agreement in which DREC loaned approximately $1.2 million to FSP Diversified for renovations on properties that FSP Diversified owned, including the Argyle property. (Indict. ¶ 1(g).) The October 2006 agreement provided that DREC would be repaid its loan prior to any distributions to FSP Diversified. (*Id.*)

## I. The Forman Loan

Pons also owned and managed an entity called JMY, LLC ("JMY"), which owned a property located at 7645 North Sheridan Road, Chicago, Illinois (the "Sheridan property") (*Id.* ¶ 1(h).) In November 2006, JMY obtained a loan from Forman Capital ("Forman") in the amount

of $2.03 million (the "Forman loan") (*Id.* ¶ 1(i); Gov. Mot., Dkt. No. 27, p. 3.) Kaplan represented Pons during the financing process of the transaction. (Gov. Mot., Ex. G, p. 1.) During the negotiation for the Forman loan, Kaplan states that Forman requested additional collateral to close the loan. (*Id.*) According to Kaplan, Forman was offered and agreed to a second junior mortgage to JMY where the Argyle property was issued as collateral. (*Id.*) Kaplan expressed concern about Forman agreeing to a collateral property where JMY had no interest and informed Forman representatives that he was unwilling to issue a written opinion regarding the loan without the consent of all members of FSP Diversified. (*Id.*, Ex. G, p. 1.) Kaplan subsequently provided Pons with a consent form for FSP Diversified members to sign before the Argyle property could be designated as collateral for the Forman loan. (Indict., ¶ 4; Gov. Mot., Ex. G, p. 2.) On November 27, 2006, Kaplan received an e-mail from Pons containing a consent form purportedly signed by DREC representatives approving the use of the Argyle property as collateral for the Forman loan. (Gov. Mot., Ex. G, p. 2.) After receiving the written consent, Kaplan issued a written opinion describing the various documents necessary to close the loan. (*Id.*) The opinion letter also stated that the documents were in good standing assuming the signatures on the documents were legitimate. (*Id.*) Thus although DREC had no interest in the Sheridan property, Pons used the Argyle property as part of the collateral for the Forman loan. (Indict., ¶ 1(h)-(i).) DREC was unaware at the time that the Argyle property had been placed as collateral for Forman's loan to JMY. (Gov. Mot., Ex. A, p. 2.) The Indictment alleges that on the closing date for the Forman loan, Pons fraudulently presented to Forman a consent form purportedly signed on DREC's behalf allowing the Argyle property to be used as collateral, when in fact Pons had fraudulently copied Cherner's signature in the consent form. (Indict. ¶ 5.)

Pons is also alleged to have informed Kaplan that he had verbal consent to proceed with the closing. (*Id.* ¶ 7.)

## II.     The Sale of the Argyle Property

In March 2007, DREC, still unaware that the Argyle property had been used as collateral for a loan to another entity, agreed to sell the Argyle property and to have Pons take care of the sale arrangements. (Indict. ¶ 1(i); Gov. Mot., Ex. A, p. 2.) DREC specifically informed Pons and Kaplan that the closing could not be executed until DREC reviewed the closing documents and provided written consent to close. (*Id.*) Kaplan also states he was aware that written consent was needed to close the loan because resolutions were signed by the FSP Diversified partners in March 2006 authorizing only the signing of the real estate contract of the Argyle property. (Gov. Mot., Ex. G, p. 2.) Kaplan prepared and sent to Miller and David Bryant, council to DREC, a new set of resolutions expanding the authorization to the sale of the property. (*Id.*) Kaplan was informed by Miller that DREC would not sign the resolutions until they saw and approved a settlement statement for the transaction. (*Id.*)

Nevertheless the closing took place and the Argyle property was sold without DREC's approval and without an expansion of the resolutions. (Gov. Mot., Ex. A, p. 2.) Kaplan has explained that he learned that the FSP Diversified partners were unaware that the Argyle sale had taken place only after Miller called him on July 16, 2007 to inquire about the status of the closing. (Gov. Mot., Ex. G, p. 2.) Kaplan states that at the time of the closing it was his understanding that DREC had either signed the resolutions or had waived its right to do so. (*Id.*) E-mails exchanged between Kaplan and Miller on July 16, 2007 further demonstrate that it was Kaplan's understanding that Miller was not only aware of the closing but had in fact "approved

the closing statements for both transactions, and had thereby given the green light to proceed with the closings." (Gov. Mot., Ex. H, p. 1.) The e-mail also notes that Kaplan believed that Pons was "willing to live without the formality of the resolutions" and that he "had [DREC's] verbal consent to proceed with the closings." (*Id.*) Kaplan has expressed that he was "surprised" and "startled" to hear that Miller did not know the closing had already taken place and, upon speaking with Miller, immediately agreed to send him the consent document. (Gov. Mot., Ex. G, p. 2.) Kaplan provided Cherner and Miller with a consent to close document purportedly containing Cherner's signature approving the sale of the Argyle property on DREC's behalf. (Gov. Mot., Ex. A, p. 2.) Miller explained to Kaplan that this was the first time he had ever seen the document with Cherner's signature. (*Id.*) Cherner stated that he did not sign the consent form. (*Id.*)

The Indictment alleges that after the closing, Pons caused $1.4 million of the proceeds from the sale of the Argyle property to be used as partial repayment of Forman's loan to JMY. (Indict. ¶¶ 1(j), 8.) The Indictment further alleges that these funds were to be paid to DREC pursuant to the August 2004 agreement through which FSP and DREC formed FSP Diversified as well as the October 2005 agreement under which DREC loaned FSP Diversified $1.2 million. (*Id.* ¶ 9.) Ultimately, DREC was paid only $121,000 from the sale of the Argyle property.[1] (*Id.* ¶ 10.) According to the Indictment, Pons engaged in a fraudulent scheme to conceal from DREC that he used the Argyle property as collateral for the Forman loan to make improvements to the Sheridan property. (*Id.* ¶ 3.)

The Government states that it has attempted to discuss with Kaplan in greater detail the circumstances surrounding the allegedly fraudulent consent form and the sale of the Argyle

---

[1] According to the Government's Motion, DREC received $185,479 from the sale.

property. (*Id.*) The Government explains that while Kaplan has expressed a willingness to cooperate and provide the government with additional information, he has indicated he cannot discuss the transactions that form the bases of the Government's charge in more detail due to the attorney-client privilege stemming from his representation of Pons in those transactions. (*Id.*) According to the Government, Kaplan has had conversations with Pons about the consent, about the sale of the Argyle property, and about other documents related to this case, but cannot divulge those conversations consistent with his attorney-client obligations.

## LEGAL STANDARD

The attorney-client privilege " 'is the oldest of the privileges for confidential communications known to the common law.' " *United States v. Jicarilla Apache Nation*, 131 S.Ct. 2313, 2320 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389. For the privilege to apply, the communication must be (1) made in confidence, (2) in connection with the provision of legal services, (3) to an attorney, (4) in the context of an attorney-client relationship. *See United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007). While the privilege belongs to the client, an attorney may assert the privilege on the client's behalf. *See Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2009). Because the privilege withholds relevant information from the fact-finder, it is construed narrowly. *See United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997).

However, "[t]he privilege doesn't extend to a client's asking his lawyer to commit a crime." *United States v. Williams*, 698 F.3d 374, 382 (7th Cir. 2012) (citing *United States v. Zolin*, 491 U.S. 554, 563 (1989), and *In re Grand Jury*, 475 F.3d 1299, 1305-06 (D.C. Cir. 2007)). The crime-fraud exception to the attorney-client privilege "places communications made in furtherance of a crime or fraud outside the attorney-client privilege." *BDO Seidman*, 492 F.3d at 815. "The exception comes from the recognition that when legal advice relates '*not to prior wrongdoing*, but to *future wrongdoing*,' the privilege goes beyond what is necessary to achieve its purpose. *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 447 (7th Cir. 2011) (quoting *Zolin*, 491 U.S. at 562-63) (emphasis in original). The purpose of the exception is to "ensure that the confidentiality afforded to communications between attorney and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *Id.* (quoting *Zolin*, 491 U.S. at 563 (internal quotation marks omitted)).

In order for the crime-fraud exception to apply, the party seeking the exception should first "present prima facie evidence that gives color to the charge by showing some foundations in fact." *United States v. Boender*, 649 F.3d 650, 655 (7th Cir. 2011) (quoting *BDO Seidman*, 492 F.3d at 818). Prima facie evidence does not mean evidence sufficient "to support a verdict in favor of the person making the claim." *Matter of Feldberg*, 862 F.2d 622, 625 (7th Cir. 1988). Rather, the term "*prima facie* evidence" is used by courts to describe evidence that is "enough to require explanation rather than evidence that by itself satisfies a more-likely-than-not standard." *Id.* at 626. Thus a "*prima facie* case" is defined "with regard to its function: to require the adverse party, the one with superior access to the evidence and in the best position to explain things, to come forward with that explanation." *Id.* (citing *Texas Dep't of Comm. Affairs v.*

*Burdine*, 450 U.S. 248, 254, n. 7 (1981), and *Washington v. Elec. Joint Apprenticeship Committee*, 845 F.2d 710, 714 (7th Cir. 1988)).

The district court may also, if necessary, "examine the privileged communications themselves to determine whether they further a crime or fraud, so long as there is a 'showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.' " *Boender*, 649 F.3d at 656 (quoting *Zolin*, 491 U.S. at 572). Because *in camera* review requires "a smaller intrusion upon the confidentiality of the attorney-client relationship than [] public disclosure," a "lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege." *Zolin*, 491 U.S. at 572 (citations omitted). In this context, the purpose of *in camera* review is to "answer open questions whether the attorney-client communications were made in furtherance of an endeavor to obstruct justice?" *Boender*, 649 F.3d at 656.

## DISCUSSION

The Court finds the evidence presented by the Government sufficient to satisfy a *prima facie* showing that Pons used Kaplan to facilitate a fraudulent scheme against DREC. Specifically, the Government has made a *prima facie* showing that Pons used Kaplan enabled Pons to (1) obtain the Forman loan for JMY using the Argyle property as collateral without DREC's knowledge, and (2) sell the Argyle property without providing DREC with its share of the proceeds without anyone at DREC being aware that the sale had taken place. Based on the evidence provided by the Government, Kaplan was an integral part of the alleged scheme because the Forman loan could not have been procured without Kaplan's opinion letter. For the

purposes of this Motion, the evidence sufficiently establishes that Pons would not have been able to procure that opinion letter without misleading Kaplan to believe that the principals at DREC had approved the arrangement. During the negotiation for the Forman loan, Kaplan states that Forman requested additional collateral to close the loan. (*Id.*, Ex. G.) According to Kaplan, Forman eventually was offered and agreed to a second junior mortgage to JMY where the Argyle property was issued as collateral. (*Id.*) Kaplan informed Forman representatives that he was unwilling to issue a written opinion regarding the loan without the consent of all members of FSP Diversified. (*Id.*, Ex. G.) Kaplan then prepared and supplied to Pons a written consent form. (*Id.*) Kaplan issued an opinion letter stating that the documents were in good standing only after receiving an e-mail from Pons on November 27, 2006 containing a written consent form purportedly signed by FSP Diversified's partners. (*Id.*)

Kaplan was also crucial to Pons's execution of the sale of the Argyle property. Although DREC agreed to sell the Argyle property in March 2007 and have Pons take care of the sale arrangements, DREC specifically informed Pons and Kaplan that the closing could not be executed without DREC reviewing the closing documents and a written consent to close. (*Id.*, Ex. A.) When the closing was delayed, Miller called Kaplan to inquire about the reason for the delay and informed Kaplan a second time not to close without DREC's written consent and sign-off on all of the closing documents. (*Id.*) The closing was able to take place without DREC's knowledge or consent because Kaplan was under the impression that Miller had reviewed and signed the closing documents.

Based upon this record, it is clear that Kaplan was used by Pons to commit fraud by concealing from DREC that the Argyle property had been designated as collateral in the Forman

loan and that the Argyle property had been sold with a majority of the proceeds going to pay JMY's loan to Forman instead of DREC's loan to FSP Diversified. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 288 ("[T]he [attorney-client] 'privilege is forfeited if the attorney is assisting his client to commit a crime or fraud.' "). The Government has demonstrated that "there is some reason to believe that the communications were intended to facilitate or conceal the alleged crime or fraud." *Abbott Labs. v. Andrx Pharms., Inc.*, 241 F.R.D. 480, 488 (N.D. Ill. 2007) (citing *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999), and *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 807 (Fed.Cir. 2000) (collecting cases)). The Government has also shown a connection between the "communications at issue and the alleged offense." *Sound Video Unlimited v. Video Shack, Inc.*, 661 F.Supp. 1482, 1486 (N.D. Ill. 1987) (citing *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985)). Accordingly, the Court finds that the Government has sufficiently made a *prima facie* showing that the crime fraud exception applies.

Once a *prima facie* showing has been made by the Government, the proponent of the privilege must "come forth with an explanation for the evidence offered against [him]." *BDO Seidman*, 492 F.3d at 818. If the Court finds the explanation "satisfactory," then the privilege remains. *Feldberg*, 862 F.2d at 626. Otherwise, "the seal of secrecy is broken." *Clark v. United States*, 289 U.S. 1, 15 (1933). In this case, Pons has not offered a response explaining why the privilege should stand. Accordingly, the Court finds that the privilege is forfeited because the Government has made a *prima facie* case that "gives colour to the charge" by showing "some foundation in fact," *BDO Seidman*, 492 F.3d at 818 (quoting *United States v. Al-Shahin*, 474

F.3d 941, 946 (7th Cir. 2007)), and because Pons has not offered a satisfactory explanation for why the privilege should remain.

## CONCLUSION

For the reasons stated above, the Government's Motion for Finding of Crime/Fraud Exception to Attorney-Client Privilege is granted. Pons is deemed to have forfeited his attorney-client privilege with respect to his communications with Kaplan regarding (1) the obtaining of the consent form purportedly indicating that DREC approved the use of the Argyle property as collateral for the Forman loan and (2) the sale of the Argyle property and subsequent partial repayment of the Forman loan.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 15, 2013